## THE STROMA.

### McCALDIN et al. v. THE STROMA.

#### (Circuit Court of Appeals, Second Circuit. December 7, 1892.)

MARITIME LIENS—SUPPLIES IN FOREIGN PORT—SPECIAL AND GENERAL OWNER.
Where towage services are rendered and supplies furnished to a foreign vessel, on the order of her foreign special owner, by one knowing or having reason to know that as between the general and special owner the latter is solely liable, and nothing is said as to the credit given, no maritime lien will be implied, though on the furnisher's books the charge is entered against the vessel "and owners." 41 Fed. Rep. 599, affirmed. The City of New York, 3 Blatchf. 189 and The India, 16 Fed. Rep. 262, limited.

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. Libel by James McCaldin and Joseph McCaldin against the steamship Stroma to recover for coal furnished and towage services rendered. The district court dismissed the libel, holding that no lien existed. 41 Fed. Rep. 599. Libelants appeal. Affirmed.

James M. Gifford, for appellants.
William D. Guthrie, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. This is an appeal from a decree of the district court for the southern district of New York, which dismissed a libel against a foreign steamship for coal furnished and towage services rendered to her while in the port of New York. 41 Fed. Rep. 599.

The steamship Stroma, a British ship owned by a British corporation, was chartered for one year by her owners to James Brown, of Bermuda. The year was to commence on August 27, 1888, when the vessel was to be placed at the disposal of Brown, in New York. The charterer was to pay for all provisions, wages, coal, fuel, and all charges except those repairs which could not reasonably be done by the crew. He was to have the entire use and control of the vessel. The steamer was to be employed in carrying freight between points from Canada to Rio de Janeiro. On August 28th, and after the Stroma was delivered to the charterer, the libelants towed her from the Erie basin to the East river. On August 30th they sold and delivered on board of her a cargo of coal, and on September 2d they towed her from the dock to the bay. The entire bill was $673.50. The district judge found that the first towage and the coal were not ordered by the master or by the agents of the general owners. It follows that they were ordered by the charterer. It was further found that the libelants' out of doors agent, who was first brought into communication with Brown, knew that he had come into control of the steamship, and was responsible for it, or knew enough of Brown's relations to the ship to put him on inquiry and ascertain the fact and the terms of the charter. It was found that the master's testimony was the most credible and probable, from which it appeared that Mr. Cruikshank (the appellants' agent) was informed and knew or supposed that Brown was the man who, as charterer, was to pay the bills. The positive testimony is principally that of conversations which are denied by the libelants, but the facts, as found by the district judge, cannot be successfully brought into dispute, and it sufficiently appears that Cruikshank knew that the general owners were not running the vessel; that Brown, as charterer, was giving directions, and was responsible for the payment of the goods which he ordered; and that the master was not directing on his own account, or for the ship in the ordinary course. The coal and the services were charged upon the books of the libelants to "S. S. Stroma and owners." Nothing was said, by captain, charterer, or libelants, in regard to the credit of the vessel; and there was no act or circumstance known to both charterer and libelants

from which a common intent in regard to the liability of the vessel could be inferred.

The case, then, is as follows: The foreign charterer of a foreign vessel, who is by the terms of the charter to pay for coal and towage, obtains coal and towage, upon his own order, in the port of New York,—not a port of distress,—but to enable the vessel to start upon her first voyage in his service. The libelants know that he is charterer, and have reason to believe that, as between him and the general owners, he is liable to pay the charges, and are put upon inquiry to ascertain the terms of the charter. There was no express pledge of the credit of the vessel, and nothing was said by the libelants, or communicated to the charterer, from which it appeared that they contemplated the credit of the vessel. It is perhaps unnecessary to say that the same presumptions by virtue of which a lien is placed upon a vessel for the payment of necessary supplies furnished to her in a foreign port upon the sole order of the master are not applicable to the case of supplies furnished in a foreign port to a vessel upon the express direction of the known general owner. In the latter case, there is not, prima facie, a presumption that there was a necessity for the credit of the ship. The known general owner may, however, expressly pledge the credit of his vessel in a foreign port for supplies, and there often are circumstances and facts which show that the credit of the vessel was pledged in fact, though not in words, and that such security was within the common intent of both parties. The Kalorama, 10 Wall. 204; The James Guy, 1 Ben. 112, 9 Wall. 758. So, also, the special owner, who is intrusted by the general owner with the possession, control, and ownership, pro hac vice, of the vessel, is intrusted also with the power, when necessity arises in a foreign port, to pledge the credit of the vessel for supplies for her relief; and a lien will be maintained when circumstances exist which show that the fact that the supplies were furnished or the work was done upon the security of the vessel was recognized by both parties. The Brig Nestor, 1 Sum. 78; The Monsoon, 1 Spr. 37; The City of New York, 3 Blatchf. 189; Thomas v. Osborn, 19 How. 22. Such a lien may attach although the vessel is not in peril or in distress, but the fact that she is in peril, and must have supplies in order to continue her voyage, make a much stronger probability that the goods were furnished upon the credit of the vessel than when they are furnished to enable the charterer to commence his voyage, and no necessity presses to relieve vessel or crew from danger or from enforced idleness.

In this case it is claimed that the facts that necessary supplies were furnished and services were rendered to a foreign vessel, at the order of the foreign charterer, and owner pro hac vice, and that the libelants did in fact, as evidenced by the manner in which they kept their books, rely also upon the credit of the vessel, are sufficient to place a maritime lien upon her. We cannot assent to the breadth of this proposition. When the known foreign special owner, not being the master, orders the supplies in a foreign port, and the libelant has reason to know that, as between the special and the general owner, the former is not the agent of the latter, but is personally,

solely liable for the debt, and he furnishes the goods in silence, there being no acts or circumstances from which it can be inferred that the credit of the ship was either within the contemplation of both parties, or was recognized by both, a maritime lien will not be implied. There is an obvious distinction between the liability of the ship for supplies furnished upon the order of the special owner, which he is solely personally liable to pay for, and the liability for contracts of affreightment which he has entered into. In the latter case the maritime law binds the vessel to the cargo. "The general owner must be taken to know that the purpose for which the vessel is hired, when not employed to carry cargo belonging to the hirer, is to carry cargo of third persons, and that bills of lading or charter parties must, in the invariable, regular course of that business, be made, for the performance of which the law confers a lien on the vessel." Freeman v. Buckingham, 18 How. 182.

In the case of a foreign owner pro hac vice, who has agreed with the general owner that he will pay for the supplies, and whose relations to the vessel and to the general owners are known to the person who furnishes supplies, the presumption is that credit is given to him personally, unless some facts or circumstances repel and overcome that presumption. In almost all cases where a stranger and foreigner seeks for credit, something will be said or done in the course of the negotiations to show that personal credit alone is not offered, or is not esteemed sufficient. If both parties indicate, in their dealings with each other, that personal credit is not questioned, the mere charge upon the books to the vessel is not adequate to create a lien. In this case the supplies were ordered by the owner pro hac vice whom the libelants' agent knew to be the charterer; the vessel was not in distress; the coal was wanted to enable her to commence work for the charterer; and there seem to have been no extrinsic circumstances, other than the charge upon the books, which repel the presumption that the supplies and work were furnished upon the credit of the special owner. The appellant relies upon the case of The India, 16 Fed. Rep. 262, which was decided by the circuit court upon the strength of what was believed to be the law of this circuit, as declared in The City of New York, 3 Blatchf. 189. Upon further consideration, we are of opinion that these two cases should not be followed to the extent which the breadth of the language in the decisions would justify. The decree of the district court is affirmed, with costs in both courts.