## THE ROSALIE.[1]

### ENSIGN et al. v. DIMON.

#### (District Court, N. D. California. September 17, 1895.)

#### No. 11,007.

1. MARITIME LIENS—MATERIAL FURNISHED IN HOME PORT—OWNERS PRO HAC VICE.
   Where materials were furnished for the use of a vessel, upon the order of a company which had possession of her under a contract of purchase, and which was, therefore, the owner pro hac vice, in the port where such company had its principal place of business, by material men who either knew the company's relation to the vessel, or were in possession of the avenues of information, and of facts sufficient to put them on inquiry, *held*, that credit must be considered to have been given to the company, and that, consequently, no lien was created. The Alvira, 63 Fed. 144, distinguished.

2. SAME.
   The mere fact that persons furnishing materials in the home port, on the order of the owner pro hac vice, "suppose" that the vessel is good for the purchase price, is not of itself sufficient to create a lien.

This was a libel in rem, by E. J. Ensign and J. R. McGuffick, against the steamer Rosalie, for materials furnished for the use of the steamer.

H. W. Hutton, for libelants.
Walter G. Holmes, for claimant.

MORROW, District Judge. A lien in the sum of $75.90 for oils and paints furnished by the libelants for the use of the steam-

[1] Rehearing pending.

er Rosalie is claimed under the admiralty law, and also of the state statute (section 813, Code Civ. Proc.). At the time materials to the amount of $70.30 were furnished by the libelant, between August 19 and October 30, 1893, the steamer was in the possession and control of the Davie Ferry & Transportation Company, under an agreement with the owner, C. L. Dimon, Jr., to purchase her for $75,000, to be paid for in certain stipulated installments. This agreement, it appears, was never consummated, for on October 30, 1893, the owner retook possession of the vessel. On October 30th and November 6th oil was furnished to the amount of $5.60, making the total of $75.90.

It may be assumed, for the purposes of this case, that the materials were necessary, and the amounts charged therefor reasonable. The real question in issue is whether credit was given to the vessel or to the Davie Ferry & Transportation Company. The company was a corporation organized under the laws of the state, and had its principal place of business at the port of San Francisco. During the period when the materials were furnished, the company was, to all intents and purposes, the owner pro hac vice of the steamer, and she was, therefore, at her home port. This fact alone would justify the presumption that the material man meant to give credit to the company personally, provided he knew the relation of the ostensible owner to the vessel. The Stroma, 41 Fed. 599, affirmed 3 C. C. A. 530, 53 Fed. 281; Stephenson v. The Francis, 21 Fed. 715; Neill v. The Francis, Id. 921; The Aeronaut, 36 Fed. 497; The Samuel Marshall, 49 Fed. 754, affirmed 4 C. C. A. 385, 54 Fed. 396; Herreshoff Manuf'g Co. v. The Now Then, 50 Fed. 944, affirmed 5 C. C. A. 206, 55 Fed. 523; The Curlew, 54 Fed. 899; The Kong Frode, 6 C. C. A. 313, 57 Fed. 224; The Alvira, 63 Fed. 144, 156. In the last case this language was used:

"Therefore, the general principle that the owner is deemed to consent to the accruing of liens where the entire possession, control, and management of a vessel is intrusted to another is qualified by this condition: If the supply or material man know of the charter, or the relation in which the ostensible owner holds, or if he be advised of the real status of such relation by the general owner or by the charterer, or is placed in possession of such facts as would put, or ought to put, a reasonably prudent man on inquiry, the presumption arises that the supplies, materials, or repairs were furnished upon the credit of the charterer himself, and there is no lien. And the onus lies on the supply or material man to remove this presumption. The reason for this is plain. Courts of admiralty do not favor secret liens. Otherwise, owners would often fall an easy prey to liens created by injudicious or unscrupulous charterers. Moreover, the supplies, materials, or repairs are generally furnished exclusively for the benefit of the charterer. At least, it may be said that he is the party primarily benefited thereby; the owner, as a general rule, being only incidentally benefited, if at all."

The Alvira was a vessel also in the possession and control of the Davie Ferry & Transportation Company as owner pro hac vice. Repairs and materials, amounting to the sum of about $2,000, had been rendered that vessel, in order to fit and equip her for the passenger service in which the company was then engaged. The company went into insolvency after the materials and repairs had been rendered. Liens were claimed under the same section of the state

statute which is made the basis of the present suit in rem. That case, however, is to be distinguished from the case at bar. There I came to the conclusion, from the evidence, that the material men had no knowledge of the fact that the Alvira was under charter to the company, nor were they in possession of such facts which would charge them, as reasonable men, with the duty of inquiry. In the case at bar, the evidence does not justify me in so finding. On the contrary, it is difficult to escape the conclusion that the libelants must have known the actual relations that existed between the Davie Ferry & Transportation Company and the owner of the Rosalie; that is to say, that the company was simply owner pro hac vice. One of the strongest circumstances indicative of this knowledge is that the libelants held some stock in the company, and, presumably, were aware of the real state of facts. Hawkins v. Glenn, 131 U. S. 319, 329, 9 Sup. Ct. 739. If they were not, they, at least, were in possession of such avenues of knowledge which, if followed up with ordinary diligence, would have led to a knowledge of the true state of facts. The testimony of Joseph J. Ebert, the general manager of the company at the time these materials were furnished, is utterly inconsistent with the idea that the libelants gave credit to the vessel. He testifies, in a deposition taken in New York: That on or about the latter part of July or the 1st day of August, 1893, he went to the office of Ensign & McGuffick, and settled all the bills that were charged against the steamer Rosalie, and closed the account against the steamer. He then told some member of the firm—whom he does not now remember—that all oils furnished for the vessel of the company from the 6th day of July (1893) were to be charged to the Davie Ferry & Transportation Company, and "not to the steamer Rosalie, or her owners." That subsequent purchases by the company were billed to the Davie Ferry & Transportation Company, and partly paid by the company, with its checks. That, at the time referred to above, he also informed the libelants that the steamer Rosalie had passed into the possession and under the control of the company. That after this interview no bills were ever sent to the steamer Rosalie, or to her owners. That, as general manager of the company, he had charge of the buying all supplies, etc., and giving orders to various departments where and how purchases should be made. That supplies purchased for the company were ordered on printed blanks, bearing the name of the company, filled out by the engineer or others in charge. The orders, introduced in evidence, bear out this testimony, and it is significant that the bills accompanying them are made out against the company. It is true that both of the libelants deny that Ebert ever called at their store and had the conversation. But this denial does not outweigh the evidence of Ebert and the circumstances of the case. They state that they supposed that the Davie Ferry & Transportation Company was the owner of the vessel, and that they "supposed" the vessel was good for the materials furnished. As to the first supposition, it appears from their own statements that before the Rosalie was controlled by the Davie Company they had furnished oils for the use of the steamer to her owner, C. L. Dimon,

Jr., whom Ensign says he knew slightly. When Dimon stopped ordering, and the Davie Company began to do so, this fact alone ought to have been sufficient to put them on inquiry. As to the second supposition, it is clearly insufficient to give a lien, any more than charging the materials against the vessel in the books of the material man, or making out the bills against the vessel, would be. While these may be circumstances in the case, yet, as a general rule, they are entitled to but little weight. The Samuel Marshall, 4 C. C. A. 392, 54 Fed. 399 (and cases there cited); The Alvira, supra. The case of The Curlew, supra, is directly in point. There the libelant supplied coal to the charterers of the British ship Curlew, at Baltimore, which was their place of residence. The charterers were charged personally on the books of the coal dealer. No reference was made to the ship as security, and no claim made against the vessel until after the failure of the charterers. It was held that the coal was furnished on the personal credit of the charterers, and not on the credit of the vessel. Judge Brown, of the Southern district of New York, said:

"The dealings of the libelants were with the charterers in person, at their place of residence, and without any reference to the ship as security for the supplies. They were presumably furnished, therefore, upon the personal credit of the charterers. The latter had no right to charge the ship, and evidently had no intention to do so. There was nothing that authorized the libelants to suppose the ship was intended to be charged, or that they had any right to charge the ship. In fact, they did not charge her. Upon their books, as well as in the bills rendered, Henry Bros. & Co. alone were charged individually. For the first portion of the bill a note was taken, and no claim was made upon the vessel until after Henry Bros. & Co. had failed. It is evident that in this case, both in law as well as in fact, the supplies were furnished upon the personal credit of the charterers. * * * The libelants were chargeable with notice of the relations of Henry Bros. & Co. to the ship. They knew that the firm was in business in Baltimore. Any inquiry would have shown that they were charterers. If they made no inquiry, they took the risk of the fact. They could not have supposed the firm to be officers of the ship; and if they did not mean to deal with them as owners, or on their personal credit, it was their duty to inquire what the connection of the firm with the vessel was."

I do not think that the libelants in this case meant to give credit to the vessel. In the case of The Alvira, it appeared in evidence that the Davie Company became insolvent. It is my opinion that the libelants in this case, in view of the inability of the company to pay, now seek to get payment for their materials by attempting to impress a lien on the vessel itself. But this, clearly, cannot be done. Admiralty liens can only be enforced according to the principles of admiralty law. The Guiding Star, 18 Fed. 263; The Samuel Marshall, supra; Lighters Nos. 27 and 28, 6 C. C. A. 493, 57 Fed. 664; The Alvira, supra. The libel will be dismissed, with costs.